IN THE NEBRASKA COURT OF APPEALS

**MEMORANDUM OPINION AND JUDGMENT ON APPEAL**
**(Memorandum Web Opinion)**

STATE V. BETANCUR

NOTICE: THIS OPINION IS NOT DESIGNATED FOR PERMANENT PUBLICATION AND MAY NOT BE CITED EXCEPT AS PROVIDED BY NEB. CT. R. APP. P. § 2-102(E).

STATE OF NEBRASKA, APPELLEE,

V.

MONTY BETANCUR, APPELLANT.

Filed December 20, 2022.    No. A-21-954.

Appeal from the District Court for Scotts Bluff County: LEO P. DOBROVOLNY, Judge. Affirmed.

Michael J. Wilson, of Berry Law Firm, for appellant.

Douglas J. Peterson, Attorney General, and Siobhan E. Duffy for appellee.

MOORE, BISHOP, and WELCH, Judges.

BISHOP, Judge.

## I. INTRODUCTION

Following a jury trial, Monty Betancur was convicted of two counts of third degree sexual assault, one count of first degree false imprisonment, and one count of tampering with a witness. The Scotts Bluff County District Court sentenced him to concurrent terms of 2 years' probation on the two counts of third degree sexual assault and the count of first degree false imprisonment. On the count of tampering with a witness, the court sentenced him to 90 days in jail and ordered him to pay a $1,000 fine. Betancur appeals his convictions, claiming errors related to the sufficiency of the evidence, the jury instructions, and the denial of a mistrial after a statement made by a prospective juror. He also claims that his trial counsel was ineffective for numerous reasons. We affirm.

- 1 -

## II. BACKGROUND

This case arises from allegations that on October 11, 2020, Betancur, while working as a paramedic, kissed a paramedic student three times, grabbed her upper thigh, and threatened to make her "life hell" if she told anyone.

On December 3, 2020, the State filed an information charging Betancur with four counts: counts I and II, third degree sexual assault, noninjury, each a Class I misdemeanor, pursuant to Neb. Rev. Stat. § 28-320(1)(a) and (3) (Reissue 2016); count III, first degree false imprisonment, a Class IIIA felony, pursuant to Neb. Rev. Stat. § 28-314 (Reissue 2016); and tampering with a witness, a Class IV felony, pursuant to Neb. Rev. Stat. § 28-919 (Cum. Supp. 2022). Ashley M. was the named victim in counts I through III.

A jury trial was held on August 25 and 26, 2021. Several witnesses testified and exhibits were received into evidence. We summarize the evidence as follows.

Ashley M., 22 years old, testified that in October 2020, she had her national EMT license and had been on the Gering Volunteer Fire Department for 3 years. She was also "working at Regional West Medical Center, but as a student at WNCC [Western Nebraska Community College] in the EMS program." She explained that the EMS program was an accelerated, 1-year program to obtain paramedic certification. Ashley's program ran from August 2020 to July 2021; there were in-person class hours 2 days per week, and then they were required to complete 675 hours of field clinical time riding along in ambulances and working in the hospital in different departments. Ride-along hours began at the end of September 2020, and at that time, Valley Ambulance Service in Scottsbluff, Nebraska, was the only option available for ride-along hours.

Ashley stated that on October 11, 2020, she was doing ride-along hours with Valley Ambulance from 7 a.m. to 7 p.m. There were two crews working that day, the Scottsbluff crew and the Gering crew. Both crews met up at the Scottsbluff station at the beginning of the shift, but then the Gering crew went to their station in Gering, Nebraska. The Gering crew "ran the Gering calls and the outline [sic] areas." The Scottsbluff crew "ran the calls in the Scottsbluff area."

Ashley, the only student riding along that day, rode with the Scottsbluff crew, Betancur and Taylor Severyn. Ashley "knew who [Betancur] was through the Gering Fire." She said, "We would end up on the same calls and then he was a preceptor for our paramedic program." She explained that preceptors "were our field instructors that would kind of take us under their wing, and they could assess our skills, they teach us new skills that we might not have used before, and they would be able to sign off on our competency packets." Ashley knew Severyn "through responding to calls over the last several years"; he was also a student in her paramedic class.

The Scottsbluff crew responded to three calls during Ashley's shift on October 11, 2020. During the first call, at around 9:30 a.m., the crew responded to a local care facility and then transferred a patient to the Regional West Medical Center ER. Betancur drove, while Ashley and Severyn provided care and treatment during transport. After unloading the patient at the hospital, Severyn reported to the ER nurses while Ashley and Betancur walked back to the ambulance bay to clean the ambulance. Ashley stated, "[Betancur] pulled me to the backside of the ambulance and kind of [grabbed my arm and] pulled me into him, and then through our facemasks, kissed me on the lips." Ashley "was kind of in shock at the time because he was the preceptor, so we were supposed to [sic] trust to help us, instead he was taking advantage of me at the time." Ashley said

- 2 -

that Betancur did not say anything, but she "said no and then just pulled [her] body back and he walked away." After Ashley loaded the stretcher into the ambulance, both she and Betancur walked back inside to get Severyn. The three of them "walked out of the air lock together," with Severyn in front. Ashley said, "[Betancur] came back towards me and then he put his right arm around my hips and butt area and pulled me back towards him again after we were walking out of the air lock into the ambulance bay." Ashley "wanted to quit, but [she] didn't know how to do that"; "[Betancur] was [her] boss that day and [she] didn't know how to get out of that situation." Ashley knew Betancur and Severyn were "really good friends and had been partners for a long-time."

Exhibit 4 is video footage from the ambulance bay air lock. Our review of the exhibit shows a male and female walking behind another male; the male walking on the left side of the female put his right hand around the female's left elbow or upper arm and then leaned his head briefly towards her head before placing his right hand on her upper right rib cage as he moved to her right side and they walked away in opposite directions to different parts of the ambulance; there was a total of 5 seconds of physical contact between the male and female.

On the drive back to the ambulance station, Severyn and Betancur were in the driver's and passenger's seats respectively, and Ashley rode in the back of the ambulance.

According to Ashley, when the signal for the second call went off later that morning, the crew was working on stretcher lifting techniques in the ambulance bay at the station. Ashley testified that Severyn went inside the living quarters "and at that time [Betancur] came back over to me and [grabbed my arm and] pulled me back in towards him and kissed me for the second time" while both were wearing masks. Neither Betancur nor Ashley said anything, but she pulled her body back. Then they walked back over to the ambulance and Severyn joined them. When asked how she felt at that moment, Ashley stated, "I wanted to again go home, but I didn't know how to tell anyone there because I didn't think it was going to make the situation any better," "I was just scared to say anything to anybody." The crew responded to a nursing home and then transferred a patient to the Regional West Medical Center ER. This time Severyn drove, while Ashley and Betancur provided care and treatment during transport. After unloading the patient at the hospital and transferring care to the ER nurses, the crew cleaned the ambulance and returned to the ambulance station.

Ashley testified that upon returning to the station, they "pretty much immediately got another call and responded to that call" from a private residence. Severyn drove again, while Ashley and Betancur provided care and treatment during transport to the Regional West Medical Center ER; it took a "few minutes" to get from the residence to the hospital. Ashley stated that the patient was having trouble breathing, so the patient was provided a "C-Pap for oxygenation, and we did vitals, and we're getting an IV line established." Describing the ambulance set up, Ashley stated that on the right side of the stretcher there are different supplies and monitors, above the patient's head is a captain's seat, and then on the left side there is a long bench where the provider sits; both Ashley and Betancur were on the bench seat. Ashley said she was inserting an IV into the patient's wrist and had the patient's wrist "on my right leg and was kind of stabilizing it to insert the IV," and "[Betancur] had one of his hands helping me stabilize it and the other hand was squeezing the inside of my left thigh the whole time." He let go of her leg after she completed the IV insertion process. According to Ashley, there was no reason for Betancur's hand to be on her thigh; the road was not bumpy and there were other places to hold onto in the ambulance. The

crew got the patient to the hospital, transferred care to a nurse, cleaned the ambulance, and returned to the ambulance station.

Ashley stated that when the crew arrived back to the Valley Ambulance station, they got out of the ambulance. She said, "as I got out of the side door, [Betancur] got of [sic] the passenger door and he, again, pulled me to him and kissed me for the third time"; both were still wearing masks. Neither one of them said anything, but Ashley pulled her body back away from him. When asked if she felt trapped when Betancur kissed her, Ashley responded, "I felt trapped, yes." She explained, "[Betancur] was significantly older that I was, he was in charge of our crew for the day, and I was scared to say anything to anybody because I knew that this was the career I wanted and I didn't want to ruin anything for that." On cross-examination, Ashley said she "felt trapped" "the whole day," "after the first time he kissed me." When asked if at any point Betancur was holding her down, she said, "The only time he was holding me was when he was squeezing my leg."

The crew did not go on any other calls during her shift, so Ashley wrote reports. She said Betancur told her she was welcome to stay until 10 p.m., but she told him she was leaving at 7 p.m. Ashley left at 7 p.m. after her reports were signed and her skill sheet was checked off by Betancur. Ashley encountered a citizen in the parking lot wanting to pay his bill for ambulance service, so she opened a door to the station and asked for an employee to help the citizen. Ashley said that Betancur walked to the door where she was and he talked to the citizen, the citizen left, and as Ashley was getting ready to leave Betancur said, "'If you say anything, I will make your life hell.'" When asked what she understood him to mean by that, she replied, "I took it as if I reported anything about what happened today, that he was going to do something to me." Ashley said, "I knew that he knew it was wrong because he was, obviously, concerned. So he was threatening me by saying that. So I knew I needed to tell somebody, I just didn't know who at that time." Later that night, Ashley told a friend what had happened that day.

At 9:42 p.m. on October 11, 2020, Betancur reached out to Ashley via Facebook Messenger. Ashley said that she did not open the message "because I didn't want him to see that I had read the message, but I had seen the message" on the screen saver. The message, which was received into evidence, stated, "I want you to be completely honest. Were you at anytime today uncomfortable??" Ashley did not respond to Betancur's message.

Ashley stated that on the morning of October 12, 2020, she went to the fire station and reported the incident to Chief Nathan Flowers. Chief Flowers testified that when Ashley walked into his office, she "immediately just started crying and broke down, so she seemed a little bit agitated, and nervous, scared." He said she was able to calm down and explain what had happened the day prior. Chief Flowers said Ashley was working in the capacity of a WNCC student, so he advised her to contact her WNCC advisor and to make a police report.

Also on October 12, 2020, Ashley went to the security office at Regional West Medical Center and told the head of security what had happened. The Scottsbluff Police Department was contacted, and two officers interviewed Ashley at Regional West Medical Center.

Officer Spencer Griess from the Scottsbluff Police Department testified that he spoke with Ashley at the hospital on October 12, 2020. Officer Griess, along with Investigator Joe Rohrer, subsequently interviewed Betancur on October 16 in the police department's interview room. The recorded interview was received into evidence as exhibit 7.

The interview shows that Officer Griess asked Betancur if he grabbed Ashley by the arm, and he responded, "Not that I recall." When asked if he kissed Ashley on the lips, Betancur stated that they were required to wear masks at all times. When Investigator Rohrer took over the interview, he also asked Betancur if he grabbed Ashley by the arm. Betancur responded that he will sometimes help someone in or out of an ambulance, but he did not recall anything specific. Investigator Rohrer informed Betancur that Ashley made allegations that Betancur kissed her. Betancur responded by saying that kissing on the lips was not possible because everyone wears masks, and additionally, Ashley's mother "had Covid." When asked if he kissed Ashley through their masks, Betancur said not that he remembered. Investigator Rohrer said it should be pretty clear when you kiss someone, and you should remember who you kiss. Betancur then responded that he sometimes hugs and kisses people during greetings or as a goodbye, but it is not romantic. He said it was possible that he greeted Ashley with a hug and a kiss on the cheek. Investigator Rohrer asked Betancur if he sent Ashley a text that said, "What, no goodbye kiss?" Betancur responded that he did not remember doing that, but it would have been more of a joke. And when asked if he sent Ashley a message asking if anything made her uncomfortable, Betancur said that he did send that message because she did not seem to be her normal joking self and she left abruptly, so he thought something had happened. Betancur also said that he and Ashley teased each other. Ashley never responded to his message, so he thought everything was okay and that Ashley was just in a hurry to get to a party she had plans to attend.

Officer Kristen Massie with the Gering Police Department testified that she was one of six female law enforcement officers in Scotts Bluff County. She was contacted by Ashley on October 15, 2020, and they met that same day. During their meeting, Officer Massie was shown Ashley's left upper inner thigh injuries. Officer Massie photographed the injuries, and the photographs were received into evidence. Ashley testified that she also took pictures of her bruises as they progressed throughout the week, and her photographs were also received into evidence.

Ashley testified that she ultimately withdrew from her paramedic class because Valley Ambulance was her only option for ride-along hours, and "Valley wasn't making any exceptions to allow me to ride with different crews that guaranteed I wouldn't be with [Betancur]."

P.A. was allowed to testify, pursuant to Neb. Rev. Stat. § 27-414 (Reissue 2016), about her encounters with Betancur. From 2004 to 2005, P.A. was working on her EMT intermediate certification at WNCC in Scottsbluff and was riding with Valley Ambulance Service for her internship. P.A. stated that she was assigned to Betancur, who was supposed to be her preceptor on her internship. According to P.A., Betancur first began making inappropriate comments about her physical appearance, usually her breasts and buttocks. She said there were also "a couple instances where he would brush up against me, like, while checking the ambulance"; Betancur would brush up against P.A.'s "backside, buttocks, um back," with "[t]he front of him." P.A. would divert and later "brought it up to administration" and asked for a different preceptor. P.A. stated that it was brought to the attention of Valley Ambulance, the hospital, and the college.

Betancur called three witnesses on his behalf, one of whom was not present when the inappropriate incidents testified to by Ashley occurred. The second witness, Tim Francisco, was part of the Gering crew on October 11, 2020, but saw Ashley when he returned to Scottsbluff at the end of his shift. Francisco stated that Ashley did not seem distressed, and she did not make a complaint to him about Betancur. The third witness, Severyn, was part of the Scottsbluff crew with

Ashley and Betancur on October 11. Severyn stated that during the call where the patient had difficulty breathing, Betancur was at the head of the cot focusing on the C-Pap settings, while Ashley was on the left side of the patient working on the IV. Severyn did not observe any odd behavior between Ashley and Betancur. When asked if Ashley ever seemed distressed or distracted that day, Severyn responded, "No." Severyn acknowledged that he and Betancur were friends and they had been partners at Valley Ambulance full time for 5 years. When asked if he had ever seen Betancur kiss anybody hello or goodbye, Severyn responded, "Just his wife."

Betancur testified in his own behalf. He was the lead paramedic for Valley Ambulance in October 2020, when Ashley was a paramedic student. Betancur testified about the three calls the Scottsbluff crew went on during Ashley's shift on October 11. However, Betancur denied kissing Ashley that day, either on the lips or through masks. He also denied putting his arm around Ashley as they were going through the air lock at Regional West Medical Center. Betancur said that in the air lock you do have to lean in to talk to someone "especially[] with the masks on" and because of "the noise of the blowers" in the air lock. Additionally, Betancur denied grabbing or squeezing Ashley's thigh that day. He said that while transporting the patient with the C-Pap, he was working the monitors while Ashley did the IV. Betancur also denied saying anything to Ashley while she was leaving that night.

Betancur did say that earlier that day he had been "teasing" Ashley after she told him she had plans to celebrate a friend's birthday that evening; "I was teasing her that so many of the Gering volunteers . . . are exposed to possible Covid, . . . that they were being quarantined, not isolation, but several more will be quarantined" so "I was just giving her a hard time about hanging out with friends, going to parties . . . [sic] than staying available" for calls since so many people were unavailable. He later sent her a message asking if anything made her uncomfortable, because he was "teasing her pretty hard." Betancur was also asked about the text mentioned in the police interview about, "no kiss goodbye." He said that it was a line from a movie, and that he meant to send that as "a raz," "kind of facetiously," to a different Ashley that he worked with at Valley Ambulance.

Following closing arguments, the jury was given its instructions, and then the case was submitted to the jury for deliberations. The jury found Betancur guilty on all four counts, and the district court entered judgment on the verdict.

The sentencing hearing was held on October 26, 2021. The district court sentenced Betancur to concurrent terms of 2 years' probation on counts I through III, the two third degree sexual assaults and the first degree false imprisonment. On count IV, tampering with a witness, the court sentenced Betancur to 90 days in jail, with credit for 1 day already served, and ordered him to pay a fine of $1,000.

Betancur appeals.

### III. ASSIGNMENTS OF ERROR

Betancur assigns, reordered and consolidated, that (1) there was insufficient evidence to support his convictions on counts I through III, (2) the district court erred when it failed to properly instruct the jury in instruction No. 3, and (3) the district court erred in denying him a mistrial after a statement by a prospective juror. Betancur also claims that his trial counsel was ineffective because counsel failed to (1) object to the improper jury instruction, (2) timely move for a mistrial

following the statement by the juror, (3) object and move for a mistrial after an improper argument by the State, (4) investigate and present evidence from a named witness and other records that would have corroborated Betancur's testimony that he did not sexually assault Ashley in the back of the ambulance, and (5) present evidence from eyewitnesses who could have corroborated Betancur's testimony that he never tampered with Ashley.

## IV. STANDARD OF REVIEW

Regardless of whether the evidence is direct, circumstantial, or a combination thereof, and regardless of whether the issue is labeled as a failure to direct a verdict, insufficiency of the evidence, or failure to prove a prima facie case, the standard is the same: In reviewing a criminal conviction, an appellate court does not resolve conflicts in the evidence, pass on the credibility of witnesses, or reweigh the evidence; such matters are for the finder of fact, and a conviction will be affirmed, in the absence of prejudicial error, if the evidence admitted at trial, viewed and construed most favorably to the State, is sufficient to support the conviction. *State v. Cerros*, 312 Neb. 230, 978 N.W.2d 162 (2022).

Whether jury instructions given by a trial court are correct is a question of law. *Id*. On a question of law, an appellate court is obligated to reach a conclusion independent of the determination reached by the court below. *Id.*

An appellate court will not disturb a trial court's decision whether to grant a motion for mistrial unless the court has abused its discretion. *State v. Figures*, 308 Neb. 801, 957 N.W.2d 161 (2021). A mistrial is properly granted in a criminal case where an event occurs during the course of trial which is of such a nature that its damaging effect cannot be removed by proper admonition or instruction to the jury and thus prevents a fair trial. *Id*.

Whether a claim of ineffective assistance of trial counsel may be determined on direct appeal is a question of law. In reviewing claims of ineffective assistance of counsel on direct appeal, an appellate court decides only whether the undisputed facts contained within the record are sufficient to conclusively determine whether counsel did or did not provide effective assistance and whether the defendant was or was not prejudiced by counsel's alleged deficient performance. *State v. Blaha*, 303 Neb. 415, 929 N.W.2d 494 (2019).

## V. ANALYSIS

### 1. SUFFICIENCY OF EVIDENCE

### (a) Third Degree Sexual Assault

Betancur contends that there was not sufficient evidence to support his convictions for third degree sexual assault.

Betancur was charged with two counts of third degree sexual assault of Ashley pursuant to § 28-320(1)(a) and (3). Count I was alleged to have occurred at Regional West Medical Center and count II was alleged to have occurred at Valley Ambulance.

Section 28-320 states in relevant part,

> (1) Any person who subjects another person to sexual contact (a) without consent of the victim . . . is guilty of sexual assault in either the second degree or third degree.
>
> . . . .

(3) Sexual assault shall be in the third degree and is a Class I misdemeanor if the actor shall not have caused serious personal injury to the victim.

As relevant here,

Sexual contact means the intentional touching of the victim's sexual or intimate parts or the intentional touching of the victim's clothing covering the immediate area of the victim's sexual or intimate parts. . . . Sexual contact includes only such conduct which can be reasonably construed as being for the purpose of sexual arousal or gratification of either party. . . .

Neb. Rev. Stat. § 28-318(5) (Reissue 2016). "Sexual parts" is not defined. However, "[i]ntimate parts means the genital area, groin, inner thighs, buttocks, or breasts." § 28-318(2). A victim may express a lack of consent through words or conduct. See § 28-318(8). The State need not prove sexual arousal or gratification, but only circumstances and conduct which could be construed as being for such a purpose. *State v. Osborne*, 20 Neb. App. 553, 826 N.W.2d 892 (2013).

At trial, Ashley testified that Betancur kissed her through their masks three times on October 11, 2020. She said that the first kiss occurred in the ambulance bay at Regional West Medical Center when "[Betancur] pulled me to the backside of the ambulance and kind of [grabbed my arm and] pulled me into him, and then through our facemasks, kissed me on the lips." Ashley said that Betancur did not say anything, but she "said no and then just pulled [her] body back and he walked away." Ashley stated that on two separate occasions later that day at the Valley Ambulance station, Betancur again pulled her to him and kissed her while both were wearing masks. She said that each time Betancur kissed her, she pulled her body back.

Betancur argues that "an unwanted kiss on the victim's lips by an actor using his own lips does not satisfy the requirements set forth in § 28-320(1) and (3) because an unwanted kiss on the lips does not meet the definitions of 'sexual contact' and 'intimate parts' set forth in § 28-318(2) and (5)." Brief for appellant at 22-23. He further argues that "[o]nly evidence of nonconsensual contact with 'the genital area, groin, inner thighs, buttocks, or breasts' satisfies the 'sexual contact' element of § 28-310(1) and (3)." Brief for appellant at 23. Betancur claims that "[t]he only evidence of 'sexual contact' with 'intimate parts' came in the form of other, uncharged crimes evidence when [Ashley] testified that Betancur grabbed her inner thigh while the two of them transported a patient between the patient's home and the Regional West Medical Center," *id.* at 24, whereas "[b]oth Count I and Count II specified that the charged third degree sexual assaults occurred at Regional West Medical Center and Valley Ambulance, respectively." *Id.*

We disagree with Betancur's contention that "an unwanted kiss on the victim's lips by an actor using his own lips" does not satisfy the requirements for third degree sexual assault in § 28-320(1) and (3) because it does not meet the definition of "sexual contact" set forth in § 28-318(5). As noted by the State, "[§ 28-318(5)] defines sexual contact as the touching of the victim's sexual *or* intimate parts" and "in order to give effect to all words of the statute, 'sexual' parts must be something different from 'intimate' parts." Brief for appellee at 19 (emphasis in original).

Statutory language is to be given its plain and ordinary meaning, and an appellate court will not resort to interpretation to ascertain the meaning of statutory words which are plain, direct,

and unambiguous. *JB & Assocs. v. Nebraska Cancer Coalition*, 303 Neb. 855, 932 N.W.2d 71 (2019). A statute's ordinary and grammatical construction is to be followed, unless an intent appears to the contrary or unless, by following such construction, the intended effect of the provisions would apparently be impaired. *Id.* It is not within the province of a court to read a meaning into a statute that is not warranted by the language; neither is it within the province of a court to read anything plain, direct, or unambiguous out of a statute. *Id.* A court must attempt to give effect to all parts of a statute, and if it can be avoided, no word, clause, or sentence will be rejected as superfluous or meaningless. *Id.*

As noted above, § 28-318(5) defines sexual contact as the touching of the victim's sexual *or* intimate parts, including the intentional touching of the victim's clothing covering the immediate area of the victim's sexual *or* intimate parts. In order to give effect to all words of the statute, "sexual" parts must be something different than "intimate" parts. While Ashley's lips were not an "intimate part" for purposes of sexual contact, they could be a "sexual part" for purposes of sexual contact.

Ashley testified that Betancur kissed her on the lips through their masks while at Regional West Medical Center, and later kissed her a second and third time at the Valley Ambulance station. One definition of "kiss" is "to touch somebody with your lips as a sign of love or sexual desire or when saying hello or goodbye." "Kiss," oxfordlearnersdictionaries.com, https://www.oxford learnersdictionaries.com/definition/english/kiss (last visited Oct. 26, 2022). Ashley said that each time Betancur kissed her he grabbed her arm, pulled her toward him, and then kissed her through their masks. The first time Betancur kissed her she "said no and then just pulled [her] body back," and after the second and third kisses she again pulled her body back.

Under the circumstances of this case and viewing the evidence in a light most favorable to the State, there was sufficient evidence to find that Betancur subjected Ashley to sexual contact without her consent. There was no evidence that Betancur caused serious personal injury to Ashley during any of the kisses. Accordingly, there was sufficient evidence to support Betancur's convictions for two counts of third degree sexual assault.

(b) First Degree False Imprisonment

Betancur also contends that there was not sufficient evidence to support his conviction for first degree false imprisonment.

Pursuant to § 28-314:

A person commits false imprisonment in the first degree if he or she knowingly restrains or abducts another person (a) under terrorizing circumstances or under circumstances which expose the person to the risk of serious bodily injury; or (b) with intent to hold him or her in a condition of involuntary servitude.

As relevant to this case, "[r]estrain shall mean to restrict a person's movement in such a manner as to interfere substantially with his [or her] liberty . . . [b]y means of force, threat, or deception[.]" Neb. Rev. Stat. § 28-312(1)(a) (Reissue 2016). And "terrorize means to fill with terror or scare"; "[t]errorize is a synonym for frighten, which means to markedly disturb with fear, throw into a state of alarm, make afraid, or terrify." *State v. Becerra*, 253 Neb. 653, 660, 573 N.W.2d 397, 402 (1998) (defined "terrorize" within context of kidnapping statute and stated it is the *intent* to

terrorize which distinguishes kidnapping from false imprisonment in the first degree; also held first degree false imprisonment is lesser-included offense of kidnapping). The district court in the present case instructed the jury that "[t]errorize means to fill with terror or scare."

Betancur argues that no rational trier of fact could find that he restrained Ashley. He contends that "[i]n every instance of unwanted kissing by force, [Ashley] immediately freed herself from the restrictions on her movement, thus these restrictions did not interfere *substantially* with her liberty." Brief for appellant at 25 (emphasis in original). And "[Ashley] did not testify that, during the unwanted touching by Betancur in the moving ambulance, that Betancur forcibly restricted her movement." *Id.*

Ashley testified that the first time Betancur kissed her she "was kind of in shock at the time because he was the preceptor, so we were supposed to trust [sic] to help us, instead he was taking advantage of me at the time." Shortly thereafter, Betancur put his arm around her while they were walking behind Severyn out of the air lock into the ambulance bay at the hospital. She said, "I wanted to quit, but I didn't know how to do that"; "[Betancur] was my boss that day and I didn't know how to get out of that situation." Ashley knew Betancur and Severyn were "really good friends and had been partners for a long-time." After Betancur kissed her the second time, Ashley "wanted to again go home, but I didn't know how to tell anyone there because I didn't think it was going to make the situation any better"; "[a]t that time I was just scared to say anything to anybody."

Later, the crew responded to the call from a private residence and treated the patient during transport to the hospital. According to Ashley, it took "a few minutes" to get from the residence to the hospital. Ashley said during transport, she was inserting an IV into the patient's wrist and had the patient's wrist "on my right leg and was kind of stabilizing it to insert the IV," and "[Betancur] had one of his hands helping me stabilize it and the other hand was squeezing the inside of my left thigh the whole time." He let go of her leg after she completed the IV insertion process. According to Ashley, there was no reason for Betancur's hand to be on her thigh; the road was not bumpy and there were other places to hold onto in the ambulance. Photographs of subsequent bruising on Ashley's thigh were received into evidence at trial.

Ashley testified that after arriving back to the Valley Ambulance station, "as I got out of the side door, [Betancur] got of [sic] the passenger door and he, again, pulled me to him and kissed me for the third time"; both were still wearing masks. When asked if she felt trapped when Betancur kissed her, Ashley responded, "I felt trapped, yes." She explained, "[Betancur] was significantly older that I was, he was in charge of our crew for the day, and I was scared to say anything to anybody because I knew that this was the career I wanted and I didn't want to ruin anything for that." On cross-examination, Ashley said she "felt trapped" "the whole day," "after the first time he kissed me." When asked if at any point Betancur was holding her down, she said, "The only time he was holding me was when he was squeezing my leg."

Viewing the evidence in a light most favorable to the State, on three occasions Betancur grabbed Ashley by the arm, pulled her to him, and kissed her. Additionally, he grabbed Ashley's thigh during an ambulance ride with a patient, using enough force to leave bruises on Ashley's thigh. Ashley felt "trapped" and "scared to say anything." The jury could find that Betancur knowingly restrained Ashley under terrorizing circumstances. Accordingly, there was sufficient evidence to support Betancur's conviction for first degree false imprisonment.

## 2. JURY INSTRUCTION

Betancur argues that the district court erred when it failed to properly instruct the jury in instruction No. 3. Betancur did not object to the giving of instruction No. 3 at the time of trial, nor did he offer an alternative instruction in its place. However, he argues that the court "committed prejudicial plain error when, contrary to the NJI2d model instructions, it instructed the jurors to convict Betancur if they found that the State merely proved each 'charge' beyond a reasonable doubt, rather than upon finding that the State proved each element of each crime beyond a reasonable doubt." Brief for appellant at 26. Plain error is error plainly evident from the record and of such a nature that to leave it uncorrected would result in damage to the integrity, reputation, or fairness of the judicial process. *State v. Pauly*, 311 Neb. 418, 972 N.W.2d 907 (2022).

Jury Instruction No. 3 initially informed the jury that there were "four counts against [Betancur]," "mean[ing] there are four crimes charged." The instruction stated that, depending on the evidence, the jury may return one of two verdicts on each count, "[g]uilty" or "[n]ot [g]uilty." The instruction then set forth the "Elements" and "Effect of Findings" as follows.

### A. ELEMENTS
### COUNT I
The elements of third degree sexual assault as charged in Count I are:

. . . .

### COUNT II
The elements of third degree sexual assault as charged in Count II are:

. . . .

### COUNT III
The elements of first degree false imprisonment are:

. . . .

### COUNT IV
The elements of tampering with a witness as charged in Count IV are:

. . . .

### B. EFFECT OF FINDINGS
You must separately consider the evidence for each count, and come to an independent decision on each count. If you find the State proved a charge beyond a reasonable doubt, you must find the defendant guilty of that charge. Otherwise you must find the defendant not guilty.

In contrast, Section B of the corresponding Nebraska pattern jury instruction reads as follows:

### B. EFFECT OF FINDINGS
You must separately consider the (here insert number) crimes charged. For each crime your task is the same. If you decide that the state proved each element (of, regarding) that particular crime beyond a reasonable doubt, then you must find the defendant guilty of that crime. Otherwise, you must find the defendant not guilty of that crime.

NJI2d Crim. 3.0.

- 11 -

Although the Nebraska pattern jury instructions are to be used whenever applicable, a failure to follow the pattern jury instructions does not automatically require reversal. *State v. Freemont*, 284 Neb. 179, 817 N.W.2d 277 (2012).

In *State v. Huerta*, 26 Neb. App. 170, 917 N.W.2d 175 (2018), Huerta was charged with one count of first degree sexual assault. The trial court instructed the jury on the elements of the crime but failed to include a separate section regarding the effects of the findings. Huerta did not object to the instruction nor did he offer an alternative instruction in its place. However, on appeal he alleged that the district court committed plain error in improperly instructing the jury regarding the elements of the crime and the State's burden of proof regarding those elements. This court noted that NJI2d Crim. 3.0 provided a pattern instruction, and said that while the district court properly instructed the jury regarding the elements of the crime, it failed to include in that instruction the separate section regarding the effect of the jury's findings. "Essentially, jury instruction No. 7 failed to inform the jury that it had to find that the State proved each element of first degree sexual assault beyond a reasonable doubt in order to find Huerta guilty of that crime." *State v. Huerta*, 26 Neb. App. at 183, 917 N.W.2d at 188. This court agreed with Huerta that the district court committed plain error in omitting that portion of the instruction, but nevertheless found that the omission did not require reversal because the omission constituted a harmless error — the other instructions given to the jury properly instructed it regarding the State's burden to prove Huerta's guilt beyond a reasonable doubt. See, also, *State v. Huerta, supra* (Welch, Judge, concurring) (instructions as whole, taken together with prosecutors' argument to jury which clearly delineated State's burden attached to each and every element of offense, left no likelihood jury applied challenged instructions in way that violated Constitution).

All the jury instructions must be read together, and if, taken as a whole, they correctly state the law, are not misleading, and adequately cover the issues supported by the pleadings and the evidence, there is no prejudicial error necessitating reversal. *State v. Huerta, supra*. And the appellant has the burden to show that a questioned jury instruction was prejudicial or otherwise adversely affected a substantial right of the appellant. *Id.*

We find that the jury instructions, when taken as a whole, properly instructed the jury that it had to find the State proved each element of each crime beyond a reasonable doubt. Instruction No. 2, set forth the four counts with which Betancur was charged. It also stated that Betancur was presumed innocent, meaning "you must find him not guilty unless you decide the state has proved him guilty beyond a reasonable doubt." It also explained "reasonable doubt." Instruction No. 3, as noted above, stated there were four counts against Betancur, meaning there were four crimes charged, and that the jury "may return one of two verdicts on each Count"; the jury may find Betancur "[g]uilty" or "[n]ot [g]uilty." Instruction No. 3 also included the "Elements" for each count and an "Effect of Findings" section as set forth previously.

In the "Elements" section of Instruction No. 3, the elements of each count were set forth in a similar manner. For example, regarding "Count I," the instruction stated:

> The elements of third degree sexual assault as charged in Count I are:
>
> 1. That the defendant subjected Ashley M[.] to sexual contact; *and*
>
> 2. That the defendant did so on or about the date charged in Scotts Bluff County, Nebraska at Regional West Medical Cetner; *and*
>
> 3. That the defendant did so without the consent of Ashley M[.]

(Emphasis supplied.) The State argues, "The word 'and' indicates that each of the elements are a part of the charge." Brief for appellee at 24. "Read as a whole, the jury was instructed that in order to convict Betancur, it had to find the State had proven each part of a charge beyond a reasonable doubt in order to convict him of that charge." *Id.* We agree. Additionally, we note that during closing arguments, the State made it clear that it had the burden to prove every element of the offenses. Accordingly, there is no prejudicial error necessitating reversal. *State v. Huerta, supra.*

### 3. MISTRIAL FOLLOWING JUROR STATEMENT

Betancur argues that the trial court erred in denying him a mistrial after "one of the prospective jurors stated before the entire venire panel that one of Betancur's family members was on trial for one or more sex offenses." Brief for appellant at 31.

During voir dire, Betancur's counsel questioned a potential juror who had apparently raised his hand when asked if anyone would have a hard time deciding the case fairly. The following conversation was had on the record.

[Counsel]: You raised your hand that you would have a hard time deciding this case fairly; is that correct, sir?

[Juror]: Yes, sir. (Inaudible).

. . . .

[Juror]: I believe one of his family members was, also, on trial for something like this. And, so already has my mind biased to say that — (inaudible).

. . . .

[Counsel]: [Juror], you had a — if I heard you correctly, again, it was a little muffled . . . . You had, was it a family member, or a friend?

[Juror]: One of his family members.

[Counsel]: Okay. And, because of the results of that trial, it leaves you thinking that anyone who is accused of this is guilty; is that correct?

[Juror]: (Undiscernible).

THE COURT REPORTER: I can't understand you, sir.

[Juror]: Because he is related.

THE COURT: Okay. Let's do this: Come on up here and — do you want this on the record?

[Counsel]: Yes — well, no, your Honor.

THE COURT: Okay. Come on back here, [Juror], so we can all talk and hear each other a little better.

Then, after a brief off-the-record discussion that took place outside the presence of the jury, that juror was excused. The court then addressed the jury stating,

I have excused [the named juror]. He made some comments about other cases. That has nothing to do with this case, won't have anything to do with this case. So disregard any comments you may have heard that [the named juror] made about other cases or relatives of Mr. Betancur. They are not relevant and they are not to be considered by you.

Betancur's counsel then proceeded with his questioning of the prospective jurors.

After the jury was passed for cause and the 12 jurors, plus 1 alternate juror, were selected, Betancur moved for a mistrial "based on, essentially, the fact that the jury has been tainted by the comments made by [the named juror] about one of Mr. Betancur's relatives being charged with sexual assault, he knows the family, he could not decide the case fairly because of that." Counsel was "concerned that the rest of the jury, especially, the people seated close to him heard this [and], despite the Court's instruction, will have that in the back of their minds as they are hearing evidence and deliberating." The court responded,

> [T]he record is what it is, I don't know if the court reporter could hear everything [the named juror] was saying, I certainly couldn't. He had a mask on, he was rambling, and he didn't speak very clearly. I heard him to say something about another family member or somebody who believed was another family member of Mr. Betancur, and possibly some other case. The record says whatever it says.
>
> And, in any event, at that point we got [the named juror] back into a private room away from the rest of the jury, discuss [sic] the matters with him, and then I excused him at that point, and admonished the jury if they did overhear anything of [the named juror], to disregard that, it's not part of the case, and it's not relevant. So the motion for mistrial is overruled.

The trial then proceeded.

The State notes that when a party has knowledge during trial of irregularity or misconduct, the party must timely assert his or her right to a mistrial. *State v. Custer*, 292 Neb. 88, 871 N.W.2d 243 (2015); *State v. Howard*, 26 Neb. App. 628, 921 N.W.2d 869 (2018). A party may not waive an error, gamble on a favorable result, and, upon obtaining an unfavorable result, assert the previously waived error. *State v. Howard, supra*.

Regardless of whether or not Betancur's motion for mistrial was timely, the district court ruled on the merits of Betancur's motion for mistrial, and we find that the court's denial of the motion was not an abuse of discretion.

A mistrial is properly granted in a criminal case where an event occurs during the course of a trial that is of such a nature that its damaging effect cannot be removed by proper admonition or instruction to the jury and thus prevents a fair trial. *State v. Schmaltz*, 304 Neb. 74, 933 N.W.2d 435 (2019). The defendant must prove that the alleged error actually prejudiced him or her, rather than creating only the possibility of prejudice. *Id*. We review the denial of a motion for mistrial for an abuse of discretion. *Id*.

Betancur contends, "the extrinsic evidence of [his] family member being a sex offender was highly inflammatory and directly connected to Betancur's guilt" because "[t]he extrinsic evidence played on the commonly held belief that a person is more likely to commit sex crimes if he comes from a family of people who commit sex crimes." Brief for appellant at 34. In support of his argument, Betancur cites us to *Mach v. Stewart*, 137 F.3d 630 (9th Cir. 1997), as amended (Nov. 20, 1997), as amended (Feb. 11, 1998). In *Mach*, the Ninth Circuit Court of Appeals granted Mach's habeas petition after finding that Mach's right to an impartial jury was violated when the jury panel was exposed to a potential juror's expert-like statements regarding the veracity of children asserting claims of sexual abuse, and the statements had a substantial influence or effect

on the jury; the potential juror was a social worker who had taken child psychology courses and worked with psychologists and psychiatrists. The Ninth Circuit stated that, at a minimum, when Mach moved for a mistrial, the trial court should have conducted further voir dire to determine whether the panel had in fact been affected by the statements. However, contrary to the potential juror in *Mach*, there is no indication that the potential juror in the present case should be treated as having made "expert-like" statements.

Immediately after the potential juror's comments and the off-the-record discussion with the juror, the district court admonished the jury that the juror's comments were not relevant to this case, and such comments should be disregarded by the jury. Moreover, in its instructions to the jury prior to deliberations, the court stated, "The evidence from which you are to find the facts consists of the following: 1. The testimony of the witnesses; and 2. Documents and other things received as exhibits." The court also listed things that were not evidence, including, "Any testimony I told you to disregard." Absent evidence to the contrary, it is presumed that a jury followed the instructions given in arriving at its verdict. *State v. Childs*, 309 Neb. 427, 960 N.W.2d 585 (2021). There is no evidence that the jury did not follow the district court's instructions to disregard the juror's comments from voir dire. Betancur has not proven that the juror's statements actually prejudiced him, and we find no abuse of discretion in the court's decision to deny a mistrial based on the prospective juror's statements.

### 4. INEFFECTIVE ASSISTANCE OF COUNSEL

### (a) General Legal Principles

Betancur has different counsel on direct appeal. When a defendant's trial counsel is different from his or her counsel on direct appeal, the defendant must raise on direct appeal any issue of trial counsel's ineffective performance which is known to the defendant or is apparent from the record. *State v. Blaha*, 303 Neb. 415, 929 N.W.2d 494 (2019).

Appellate courts have generally reached ineffective assistance of counsel claims on direct appeal only in those instances where it was clear from the record that such claims were without merit, or in the rare case where trial counsel's error was so egregious and resulted in such a high level of prejudice that no tactic or strategy could overcome the effect of the error, which effect was a fundamentally unfair trial. *State v. Sundquist*, 301 Neb. 1006, 921 N.W.2d 131 (2019). An ineffective assistance of counsel claim made on direct appeal can be found to be without merit if the record establishes that trial counsel's performance was not deficient or that the appellant could not establish prejudice. *Id.*

Generally, to prevail on a claim of ineffective assistance of counsel under *Strickland v. Washington*, 466 U.S. 668, 104 S. Ct. 2052, 80 L. Ed. 2d 674 (1984), the defendant must show that his or her counsel's performance was deficient and that this deficient performance actually prejudiced the defendant's defense. *State v. Mrza*, 302 Neb. 931, 926 N.W.2d 79 (2019). To show that counsel's performance was deficient, a defendant must show that counsel's performance did not equal that of a lawyer with ordinary training and skill in criminal law. *Id.* To show prejudice, the defendant must demonstrate a reasonable probability that but for counsel's deficient performance, the result of the proceeding would have been different. *Id.* A reasonable probability is a probability sufficient to undermine confidence in the outcome. *Id.*

With these governing principles in mind, we turn now to address Betancur's claims of ineffective assistance of counsel.

### (b) Failure to Object to Jury Instruction

Betancur claims that his trial counsel was ineffective when counsel failed to object to jury instruction No. 3. We find that even if trial counsel was deficient for failing to object to jury instruction No. 3, Betancur cannot show prejudice. We have already determined that the jury instructions, taken as a whole, properly instructed the jury and thus there was no prejudicial error necessitating reversal. Accordingly, this claim of ineffective assistance of trial counsel fails.

### (c) Failure to Timely Move for Mistrial Following Juror Statement

Betancur claims that if this court concludes that his trial counsel failed to timely move for a mistrial following the statement by the juror, then trial counsel's failure constitutes ineffective assistance. Regardless of the timeliness of the motion for mistrial, Betancur cannot show prejudice. The trial court ruled on the merits of counsel's motion for mistrial, and we have already found that the court's denial of a mistrial was not an abuse of discretion. Accordingly, this claim of ineffective assistance of trial counsel fails.

### (d) Failure to Timely Object and Move for Mistrial
### Following Improper Argument by State

Betancur also claims that his trial counsel was ineffective when counsel "failed to object and move for a mistrial due to the State's improper argument to the jury that they could find Betancur guilty of Count II, a third degree sexual assault 'at Valley Ambulance,' based upon evidence that Betancur sexually assaulted [Ashley] well after they left Valley Ambulance." Brief for appellant at 37.

Counts I and II of the information charged Betancur with the third degree sexual assault of Ashley at Regional West Medical Center and Valley Ambulance, respectively.

During closing arguments, the State said:

> So Count I relates to the kiss after the first call in the ambulance bay at Valley — or at Regional West. And, Count II, you have some different options from which you can find sexual contact. It's the kiss that occurred at the ambulance bay for Valley, the first before that deployment to the second nursing home, and the other kiss that happened there, being when they were undergoing some of the skill-building on lifting. *Or you can find it from the groping of* [*Ashley's*] *inner thigh while on that call in the Valley ambulance and transporting that patient to the hospital.*

(Emphasis supplied.)

Betancur argues that "[b]y describing with particularity the location of the Valley Ambulance Station, Count II [in the information] put Betancur on notice that he would need to defend against the State's allegations that he sexually assaulted [Ashley] at least once 'at Valley Ambulance.'" Brief for appellant at 37. However, he claims that the State's argument, as italicized above, "erroneously invited the jury to convict Betancur on evidence that did not conform to the particular location described in Count II." *Id.* And trial counsel's failure to object or move for a

- 16 -

mistrial "serves to waive Betancur's right to assert on appeal that the prosecutor engaged in irregularity or misconduct." *Id.* at 38. Betancur claims he was prejudiced by counsel's failure to object or move for a mistrial because the State did not otherwise introduce sufficient evidence "demonstrating that he made sexual contact with Ashley on any of the occasions where he grabbed her by the arm and gave her an unwanted kiss through their respective masks." *Id.*

Even if trial counsel was deficient in failing to object or move for a mistrial regarding the State's closing argument, Betancur cannot show prejudice. The jury was instructed that "what the attorneys say is not evidence." The jury was also instructed with the counts Betancur was charged with, including that he subjected Ashley to sexual contact "at Regional West Medical Center" (count I) and "at Valley Ambulance" (count II). The jury was then instructed on the elements of each count, which instruction included the locations where counts I and II occurred, "at Regional West Medical Center" and "at Valley Ambulance," respectively. Absent evidence to the contrary, it is presumed that a jury followed the instructions given in arriving at its verdict. *State v. Childs, supra*. Finally, we have already determined that Betancur's unwanted kissing of Ashley through their masks qualified as sexual contact in this case. Two of those kisses occurred at Valley Ambulance, and either one of those two kisses was sufficient to convict Betancur on count II. Thus, even if trial counsel was deficient in failing to object or move for a mistrial regarding the State's closing argument, Betancur cannot show prejudice. Accordingly, this claim of ineffective assistance of trial counsel fails.

### (e) Failure to Investigate and Present Evidence Regarding Sexual Assault

Betancur claims that his trial counsel was ineffective when counsel failed to investigate and present evidence from a named eyewitness (the patient) and other records that would have corroborated Betancur's testimony that he did not "sexually assault" Ashley in the back of the ambulance while transporting the patient. Brief for appellant at 40.

However, Betancur was neither charged nor convicted of sexually assaulting Ashley (i.e., by grabbing her thigh) in the back of the ambulance while transporting the patient. Both counts I and II specified that the charged third degree sexual assaults occurred at Regional West Medical Center and Valley Ambulance, respectively. Trial counsel could not be deficient for failing to investigate or present evidence regarding an uncharged crime. Accordingly, this claim of ineffective assistance of trial counsel fails.

### (f) Failure to Present Evidence Regarding Witness Tampering

Betancur also claims that his trial counsel was ineffective when counsel failed to present evidence from eyewitnesses who could have corroborated Betancur's testimony that he never tampered with Ashley. Although the names of the eyewitnesses were not specified in Betancur's assignment of error, he did name them in the argument section of his brief. He specifically stated that Tim Francisco, Tina Lara, Taylor Severyn, and Stephanie Dalbey-Perkins "were within earshot at the time [Ashley] testified that Betancur threatened to make [her] 'life hell' if she said anything." Brief for appellant at 39. Betancur claims that at least some of these witnesses could have corroborated his testimony that he made no such threat. Why trial counsel did not call the named witnesses to testify at trial is not apparent from our record. Accordingly, we find the record

on direct appeal is insufficient to review Betancur's claim that trial counsel was ineffective for failing to present evidence from those witnesses.

## VI. CONCLUSION

For the reasons stated above, we affirm Betancur's convictions. Additionally, we find that the record on direct appeal is insufficient to address Betancur's claim that trial counsel was ineffective when counsel failed to present evidence from eyewitnesses who could have corroborated Betancur's testimony that he never tampered with Ashley. We find Betancur's remaining ineffective assistance of trial counsel claims fail.

AFFIRMED.